Robert D. NELLIGAN and Owen B. Nelligan, Jr., partners doing business under the partnership name of The Nelligans, Plaintiffs,

v.

FORD MOTOR COMPANY, a corporation, Defendant.

Civ. A. No. 1755.

United States District Court
W. D. South Carolina,
Greenville Division.

April 9, 1958.

Thomas A. Wofford, Greenville, S. C.,
Myron N. Krotinger, Cleveland, Ohio, for
plaintiffs.

Wesley M. Walker and J. D. Todd, Jr.,
Leatherwood, Walker, Todd & Mann,
Greenville, S. C., for defendant.

WILLIAMS, District Judge.

Defendant has moved to dismiss the
amended complaint on the ground that
it does not state a claim upon which re-
lief can be granted. The complaint seeks
treble damages for alleged violations of
Sections 1 and 2 of the Sherman Act (15
U.S.C.A. §§ 1, 2) and Section 3 of the
Clayton Act (15 U.S.C.A. § 14). After
the filing of a similar motion to the orig-
inal complaint, plaintiffs moved to amend,
and did amend, their complaint to its
present form.

#### The Parties

The plaintiffs, Robert D. Nelligan and
Owen B. Nelligan, were partners carry-
ing on a motor car business in Greenville,
South Carolina under the trade name of
The Nelligans. This partnership was
organized in September of 1953 as suc-
cessor to Bob Nelligan Motor Company
(formerly Traver Motor Company), a
South Carolina corporation, and was the
Lincoln-Mercury dealer in the Green-
ville area by virtue of assignment of
Dealer's Sales Agreement with consent
of defendant on November 6, 1953.

The defendant is Ford Motor Com-
pany, the manufacturer of Ford, Mer-
cury and Lincoln automobiles.

#### The Allegations of the Amended Complaint

The amended complaint in substance
alleges that in 1947 the Lincoln-Mercury

Dealers Advertising Fund (L.M.D.A.) was organized as a non-profit Florida corporation with the knowledge and consent of Ford for the purpose of advertising Lincoln-Mercury automobiles. Plaintiffs and other Lincoln-Mercury dealers were required to become members of L.M.D.A. and to make contributions thereto at the rate of $25 a car purchased. Ford, it is alleged, conspired with L.M.D.A. (not a party to this action) to collect the above referred to charges, using the sixty day termination clause in the Dealer's Sales Agreement as a means of coercing plaintiffs and other dealers to continue their membership in and contributions to L.M.D.A.

The funds so collected were chiefly expended by L.M.D.A. in sponsoring the Ed Sullivan Show, a nationwide television program, over the Columbia Broadcasting System. This program, it is alleged, was not received in Greenville, there being no CBS outlet there at that time, although there is at the present time.

It is alleged that the purpose and effect of this alleged conspiracy was to "tie in" the sales of national advertising originating and sponsored by defendant with the sale of defendant's automobiles. It is further alleged that the purpose and effect of this was to preclude plaintiffs and other Lincoln-Mercury dealers from resorting to competitive media of advertising and this is said to be in violation of Section 3 of the Clayton Act. However, it is alleged in Paragraph XIV of the complaint that in the year 1953 plaintiffs spent $12,740.82 advertising locally, $11,510 in Dealer's Advertising Co-op advertising and $13,300 in contributions or assessments to L.M.D.A.

The amended complaint alleges then that plaintiffs early in 1954 began to protest these payments to L.M.D.A., the total amount of which ran to $60,000 since plaintiffs felt the Ed Sullivan Show did them no good, and that plaintiffs had been damaged in that sum.

There is a second cause of action which alleges that on April 13, 1954 Ford gave notice of its intention to terminate plaintiffs' Sales Agreement in accordance with its terms, and that such termination was because of plaintiffs' protest against, and unwillingness to continue, the payments to L.M.D.A. This, it is said, was in violation of the anti-trust laws and because of such termination, it is alleged plaintiffs, were damaged in the sum of $150,000.

Judgment is sought in the amount of $630,000 and for costs and a reasonable attorneys' fee.

There are two other allegations of the amended complaint which should be mentioned. It is alleged that the sales agreements entered into between Ford and its dealers, including the plaintiffs, contained provisions "which permitted defendant company to monopolize the market for cars, parts and accessories presented by the many thousands of dealers who entered into such agreements with the defendant company in violation of Section 2 of the Sherman Act". Paragraph VIII. And in Paragraph IX it is alleged that "Defendant's ability to terminate a dealership and the business of any dealer with consequent heavy financial loss to the dealer has been used as a means of coercing the plaintiff in violation of Section 1 of the Sherman Act, along with other dealers of the defendant company, into courses and methods of conducting business which they, as independent businessmen, would not pursue but for the power of the defendant company to inflict severe financial loss upon them as a result of that termination".

### Discussion of Law

At the outset it would be well to state that the main and primary purpose of the Sherman Act and the Clayton Act was to protect the public from the evils arising out of monopolies and unreasonable restraints of trade in interstate commerce. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 1934, 72 F.2d 885; Schwing Motor Co.

v. Hudson Sales Corp., D.C.Md.1956, 138 F.Supp. 899. The private right to maintain an action for treble damages given by Section 4 of the Clayton Act, 15 U.S. C.A. § 15, is purely incidental and subordinate to this primary purpose of protecting the public.

■ To recover in a private treble damage suit under the anti-trust laws, the plaintiff must allege facts from which it can be said that there has been a violation of the anti-trust laws resulting in injury to the public, and damages to the plaintiff as a result of such violation. The rule is admirably expressed by the Court of Appeals for the Fourth Circuit in Glenn Coal Co. v. Dickinson Fuel Co., supra [72 F.2d 887].

"To recover, the plaintiff must establish two things: (1) A violation of the Anti-trust Act, and (2) damages to the plaintiff proximately resulting from the acts of the defendant which constitute a violation of the Act. * * *"

Among the many other decided cases to the same effect are Wilder Mfg. Co. v. Corn Products Refining Co., supra; Arthur v. Kraft-Phenix Cheese Corp., D.C., 26 F.Supp. 824; Hudson Sales Corp. v. Waldrip, 5 Cir., 1954, 211 F.2d 268, certiorari denied 348 U.S. 821; 75 S.Ct. 34, 99 L.Ed. 648; Feddersen Motors v. Ward, 10 Cir., 1950, 180 F.2d 519; Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236; Schwing Motor Co. v. Hudson Sales Corp., supra; Interborough News Co. v. Curtis Publishing Co., D.C.S.D.N.Y., 127 F.Supp. 286; Riedley v. Hudson Motor Car Co., D.C. W.D.Ky., 82 F.Supp. 8.

Plaintiffs have invoked Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2 and Section 3 of the Clayton Act, 15 U.S.C.A. § 14, which it is said have been violated by the defendant to the injury of the public and the plaintiffs. If the amended complaint does not allege facts from which such can be shown, then the motion to dismiss must be granted.

### Does the Amended Complaint Show a Violation of Section 3 of the Clayton Act?

Section 3 of the Clayton Act (15 U.S. C.A. § 14) reads as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

There is no allegation in this amended complaint that alleges the defendant sold or made a contract for sale of any of its goods, wares, merchandise, machinery, supplies or other commodities on the condition that plaintiff or anyone else should not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor of the Ford Motor Co.

■ The plaintiffs allege that defendant "tied" the sale of its automotive products with the sale of its advertising. Passing over for the moment the defendant's position that it is not in the advertising business and is a purchaser rather than a seller of advertising,[1] its further

---

1. In Miller Motors, Inc., v. Ford Motor Company, 4 Cir., 252 F.2d 441, 446, the

plaintiff based his unsuccessful case on L.M.D.A. as being a violation of the anti-

position that it is not a competitor of any advertising company, and the contention that advertising is not a "commodity" within the terms of Section 3 of the Clayton Act,[2] it seems clear that there has been no "tie in" within the contemplation of Section 3 of the Clayton Act.

In Judson L. Thomson Mfg. Co. v. Federal Trade Commission, 1 Cir., 1945, 150 F.2d 952, 955, there is a good explanation of a "tying" contract within the meaning of Section 3 of the Clayton Act. The Court said:

"Congress passed the Clayton Act, 38 Stat. 730, to promote competition by protecting it from certain practices which might lessen it or tend to create a monopoly. § 3 strikes at practices relied on to limit competition in the distribution of goods which restrict the right to deal in competing products. Among these are the so-called 'exclusive dealing arrangement' and the 'tying contract.' The former involves the condition that the purchaser or lessee of goods shall *deal only in the goods of the seller* or lessor and *refrain from dealing in the goods of competitors;* the latter involves a condition that the goods sold or leased shall be *used only with other goods of the seller or lessor*, the purchaser or lessee agreeing not to deal in such other goods of competitors, or, as in this case, the leasing of equipment on the condition that it shall be used only with supplies of the lessor. Where the effect of such arrange-

ments 'may be to substantially lessen competition or tend to create a monopoly' they are unlawful." (Emphasis added.)

■ It will be seen that a "tying" contract has two very definite essentials:

(1) That goods sold or leased by the seller should be used only with *other goods of the seller or lessor,* and

(2) That the purchaser or lessee agrees that *he will not deal in such other goods* of a competitor.

■ A true "tie in" sale is violative of Section 3 of the Clayton Act because it requires or has the effect of requiring the puchaser to deal *exclusively* with the seller. This is explained clearly at pages 137–139 of The Report of the Attorney General's National Committee to Study the Antitrust Laws (March 31, 1955) which is the latest and most authoritative text on such laws. It is summed up on page 139 as follows:

"But the element common to all practices reached by the statute was *exclusion of rival sellers*—either by the terms of the arrangement or its necessary effects." (Emphasis added.)

Here there is no allegation that Ford required an agreement from The Nelligans that they would not patronize any other advertising company than Ford or L.M.D.A. (assuming that Ford controlled L.M.D.A., but see below,[3] and that Ford or L.M.D.A. was selling advertising, which it was not), no allegation of

trust laws. The Court said, "It is not shown that Ford had any interest in the Kenyon and Eckhardt Advertising Agency except to *obtain* effective advertising service from it. Ford was not using its economic position as an automobile manufacturer to invade and dominate the advertising business". (Emphasis added.)

2. In Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 609, 73 S.Ct. 872, 881, 97 L.Ed. 1277, it was said that the Government explained it did not bring the action under the Clayton Act because of an early Federal Trade Commission ruling that advertising was not a "com-

modity". Mr. Justice Clark stated, "We express no views on that statutory interpretation". Of course, advertising is a part of interstate commerce. Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162, but that is something different from being a "commodity".

3. In Miller Motors, Inc., v. Ford Motor Company, 4 Cir., 1958, 252 F.2d 441, 445, the Court said regarding the relationship between L.M.D.A. and Ford, "Thus it is seen that a considerable measure of autonomy was exercised by the dealers in the administration of the funds created by their contributions".

any exclusion of rival sellers by Ford. And as a matter of fact, the positive allegation of the amended complaint show that The Nelligans were not foreclosed from other media of advertising and did patronize other media. In 1953 they spent $12,740.82 advertising locally, $11,510 on dealer cooperative advertising and only $13,300 on L.M.D.A. See Paragraph XIV of amended complaint.

The amended complaint does not allege a violation of Section 3 of the Clayton Act.

### Does the Complaint Allege a Violation of Section 2 of the Sherman Act?

■ Section 2 of the Sherman Act (15 U.S.C.A. § 2) reads as follows:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The only reference in the amended complaint to Section 2 is found in Paragraph VIII. There it is alleged:

"Each such agreement contained provisions which permitted defendant company to monopolize the market for cars, parts and accessories presented by the many thousands of dealers who entered into such agreements with the defendant company in violation of Section 2 of the Sherman Act."

This allegation charges Ford with monopolizing the market for Lincoln-Mercury cars, parts and accessories, but every manufacturer has a monopoly on his brand name products, and such a monopoly does not run afoul of Section 2 of the Sherman Act.

Judge Chesnut clearly expressed the rule in Arthur v. Kraft-Phenix Cheese Corp., supra [26 F.Supp. 828] where he said:

"Every manufacturer has naturally a complete monopoly of his particular product, especially when sold under his private brands, and no private controversy with a distributor could legally tend to increase that type of a natural monopoly. The Sherman Act is, therefore, clearly not really involved."

In the recent case of United States v. E. I. Du Pont De Nemours & Co., 351 U. S. 377, 76 S.Ct. 994, 1006, 100 L.Ed. 1264, decided June 11, 1956 it was held that, although Du Pont might have a monopoly in cellophane, since there were other similar competing flexible wrappings, there was no illegal monopolization within the meaning of Section 2 of the Sherman Act. The Supreme Court, speaking through Mr. Justice Reed, said:

"Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product."

There is no allegation that Ford or L.M.D.A. monopolizes the television advertising market, nor that Ford monopolizes the motor car business in any relevant market; only that Ford has a monopoly in the sale of the Lincoln-Mercury automobiles, parts and accessories which it manufactures and sells under its own brand or trademark. Such an allegation fails to allege a violation of Section 2 of the Sherman Act.

### Does the Amended Complaint Allege a Violation of Section 1 of the Sherman Act?

Section 1 of the Sherman Act (15 U.S. C.A. § 1) makes unlawful a conspiracy

resulting in an unreasonable restraint of trade in interstate commerce. The Section reads as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. * * *"

█ Only undue or unreasonable restraints are prohibited. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533; Miller Motors, Inc., v. Ford Motor Company, 4 Cir., 1958, 252 F.2d 441.

█ Plaintiffs contend that Ford, in conspiracy with L.M.D.A., compelled The Nelligans, along with other Lincoln-Mercury dealers, to contribute to L.M.D.A. $25 a car for the purpose of advertising Lincoln-Mercury cars on the Ed Sullivan Show, that this prevented The Nelligans and other dealers from resorting to competitive media of advertising and that thus there was an unreasonable restraint of interstate trade in advertising.

I do not agree. The allegations of the amended complaint do not show any unreasonable restraint of interstate commerce in advertising. The allegations of Paragraph XIV of the amended complaint show beyond any question that plaintiffs were not foreclosed from competitive media of advertising.

There is no good reason advanced as to why Ford should seek to exclude its dealers from any additional advertising media. Even if it be conceded, as plaintiffs argue, that Ford Motor Company is in the advertising business, it must also be conceded that its principal business is the manufacture and sale of its motor cars. Paragraph II of the amended complaint. Its only real connection with the advertising business is to promote the sale of such cars. Paragraph X of the amended complaint.

Miller Motors, Inc., v. Ford Motor Company, supra is directly in point.

There the Court of Appeals for this Circuit, speaking through Judge Sobeloff, said on the reasonableness of the L.M.D.A. arrangement there complained of as being violative of Section 1 of the Sherman Act:

"It is enough that here substantial advantages inured to the dealers through the device of a single advertising program; that, as the Court below found, the L.M.D.A.'s enjoyed almost complete autonomy as to their choice of advertising counsel, media, and copy, and that the restraint imposed by higher costs of products through advertising is only an incidental one, the recognized purpose and usual effect of advertising being the increase of trade and not its restraint. It is not shown that Ford had any interest in the Kenyon and Eckhardt advertising agency except to obtain effective advertising service from it. Ford was not using its economic position as an automobile manufacturer to invade and dominate the advertising business."

There was no unreasonable restraint in Miller Motors, nor is there one here.

Quoting again from the Miller case:

"We agree that merely selecting a single agency, to gain the advantage of co-ordinated advertising, did not in the circumstances restrain commerce in advertising."

So it is here, and there is no unreasonable restraint of trade in violation of Section 1 of the Sherman Act alleged.

The Court of Appeals held in the Miller case that Section 1 of the Sherman Act had not been violated also because no conspiracy to violate the Act was shown. The Court said:

"Even if we accept plaintiff's argument that L.M.D.A.'s are a creation of the Ford Motor Company, organized solely to raise advertising funds for its products, the action would nevertheless fail. It is

not sufficient for the plaintiff to prove a co-operative effort between Ford and L.M.D.A., but it must be shown that the combination has the objectionable features which the act is designed to prevent. Alexander Milburn Co. v. Union Carbide & Carbon Corp., 4 Cir., 1926, 15 F.2d 678, 682."

Firmly ingrained in anti-trust law is that before a plaintiff may recover in a treble damage suit, he must show public injury. Alexander Milburn Co. v. Union Carbide & Carbon Co., 4 Cir., 1926, 15 F.2d 678; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 1934, 72 F.2d 885; Arthur v. Kraft-Phenix Cheese Corp., D.C., 26 F.Supp. 824; Schwing Motor Co. v. Hudson Sales Corp., D.C., 138 F.Supp. 899, affirmed and opinion adopted by Court of Appeals as its own, 4 Cir., 1956, 239 F.2d 176; Hudson Sales Corp. v. Waldrip, 5 Cir., 1954, 211 F.2d 268, certiorari denied 348 U.S. 821, 75 S.Ct. 34, 99 L.Ed. 648.

The Court of Appeals in the Miller case gave the absence of public injury in the alleged acts of Ford in connection with L.M.D.A. as still another reason for denying plaintiff relief in Miller Motors. The opinion states:

"Therefore, there being no showing of any public injury resulting from a restraint of commerce in automobiles or advertising, it cannot be said that the Sherman Act has been violated."

There is still another reason why the amended complaint should be dismissed. To recover in a treble damage suit, the plaintiff must not only show violation of the anti-trust laws and public injury, but he must also show that the acts of defendant which constitute an alleged violation of the anti-trust laws likewise directly damaged plaintiff in his private business. Conference of Studio Unions v. Leow's, Inc., 9 Cir., 1951, 193 F.2d 51, certiorari denied 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687.

Judge Sobeloff expressed the rule clearly in Miller Motors where he said:

"The hybrid nature of a private antitrust suit dictates that, to succeed, the plaintiff must prove not only that the defendant has infringed one or more of the antitrust laws to the public injury, but also that such infringement has resulted in private injury to the plaintiff in its business or property. 15 U.S. C.A. Sec. 15. In the absence of a showing of either the public or the private harm, the plaintiff cannot prevail."

And in applying the rule to that case where the same contention was made as here, the Fourth Circuit said:

"Even though Miller Motors received $716.37 more in L.M.D.A. advertising than it paid for, the plaintiff further argued that the cost of L.M.D.A. advertising is included in the sale price of Lincoln and Mercury automobiles, thereby creating a 'higher price tag' for prospective buyers of defendant's automobiles. If this was the case, even if a conspiracy in violation of the Sherman Act existed, any increases in the price of defendant's product were passed on (together with a profit) to the ultimate consumer; and under the settled decisions, plaintiff has suffered no injury for which the law will permit him treble damages. 'If appellants did not absorb such increase in price but passed it on to their customers, they could not recover in a treble damage action brought under the antitrust act.' Wolfe v. National Lead Company, 9 Cir., 1955, 225 F.2d 427, 433, certiorari denied 350 U.S. 915, 76 S.Ct. 198."

If plaintiff were to contend that any alleged price increases were absorbed by the plaintiff, then, of course, the public is unaffected, and in a private treble damage suit there must be a concurrence of public and private injury. Glenn Coal Co. v. Dickinson Fuel Co., supra.

There is no substantial difference between the allegations of the amended complaint here and the Miller Motors, Inc., v. Ford Motor Company case so far as Section 1 of the Sherman Act is concerned. The amended complaint should be dismissed since (1) there is no unreasonable restraint of trade, (2) there is no conspiracy to violate the anti-trust laws, (3) there is no public injury involved and (4) there is no injury to the plaintiffs resulting directly from any alleged violation of the anti-trust laws.

Plaintiffs rely upon United States v. General Motors Corp., 7 Cir., 1941, 121 F.2d 376.

Judge Sobeloff clearly distinguished the General Motors case from Miller Motors Inc., v. Ford Motor Company, when he said:

"In the General Motors case, to the contrary, it was shown that the defendant, reaching out to monopolize the business of financing the resale of automobiles of its manufacture, formed a conspiracy unreasonably to interfere with commerce. The court declared that the mandatory scheme to impose the financing of automobile sales through a concern which it wholly owned, and whose profits it enjoyed, was unreasonable and bore no relation to the good will of General Motors or its line of cars. It characterized the defendant's claim that the plan was designed to stimulate sales, as so farfetched that 'it would have been surprising had the jurors accepted it.' United States v. General Motors Corporation, 7 Cir., 1941, 121 F.2d 376, 412. This is sufficient to point up the contrast between the two cases."

This is likewise sufficient to point out why the General Motors case is not applicable here.

### Conclusion

. I conclude that the amended complaint does not allege any violation of Sections 1 and 2 of the Sherman Act or Section 3 of the Clayton Act. It does not state a claim upon which relief can be granted under the anti-trust laws.

The motion to dismiss the amended complaint is hereby granted.