[Civ. No. 40428. First Dist., Div. Two. Jan. 30, 1980.]

SUBURBAN MOBILE HOMES, INC.,
Plaintiff and Appellant, v.
AMFAC COMMUNITIES, INC., et al.,
Defendants and Respondents.

536

COUNSEL

Carr, Smulyan & Hartman and Yale H. Smulyan for Plaintiff and Appellant.

Gendel, Raskoff, Shapiro & Quittner, Richard I. Berger, Frank C. Christl, Palmer, Grundstrom & Duckworth and Bruce M. Palmer for Defendants and Respondents.

OPINION

CALHOUN, J.*—This is an appeal from a judgment of nonsuit rendered in favor of defendants in an action brought for violation of the California antitrust law (Cartwright Act, Bus. & Prof. Code,[1] § 16700 et seq.).

The parties to the lawsuit are plaintiff Suburban Mobile Homes, Inc. (hereafter Suburban or appellant) and four named defendants (hereafter respondents): AMFAC Communities, Inc. (AMFAC), Instant

---

*Assigned by the Chairperson of the Judicial Council.

[1]Unless otherwise indicated, all further references will be made to the Business and Professions Code of California.

Housing Corp. (Instant), Roberts & Aguirre Mobile Home Sales, Inc. (R & A), and S & S Mobile Home Sales, Inc. (S & S). Suburban is a mobile home dealer with its principal place of business in South San Francisco. AMFAC is the owner and developer of a mobilehome park known as "Franciscan Bay Mobile Country Club" (hereafter Franciscan), located in Daly City, California. The three other respondents are mobilehome dealers, selling mobilehomes in the San Francisco trading area and elsewhere.

The centerpiece of the present litigation is the use of mobilehome sites in the Franciscan. As the relevant evidence reveals, the Franciscan was developed by AMFAC by about 1971. It had 501 mobilehome sites capable of accommodating double-wide mobile homes sold by Suburban. While at the outset the Franciscan was an open park where home sites were available to all buyers irrespective of from which dealer they purchased their mobilehomes, at the end of 1971 AMFAC entered into agreement with four mobilehome dealers, including the three corespondents here. In essence, these agreements and the amendments thereto, secured 288 spaces out of the 501 total for 4 named participating dealers who gained exclusive right to display their mobilehomes in the Franciscan. In return for an exclusive right to display their merchandise and reservation of home sites in the park, the participating dealers were obligated to pay a certain sum of money to AMFAC. For instance, the park promotion agreement concluded between R & A and AMFAC provided that R & A shall contribute to the park promotion and advertising costs up to $1,200 per month, and also that R & A shall pay AMFAC $200 for each coach sold in the park in consideration for reserving space for the home sold. The evidence introduced at trial showed that until fall 1972, R & A in fact paid AMFAC $500 for every coach sold in the Franciscan.

Since the sales of mobilehomes are dependent upon the availability of suitable mobilehome sites in the trading area, Suburban's business was seriously affected by the aforesaid restrictive agreements and the actual sales practice conducted pursuant thereto. The evidence adduced at the trial convincingly demonstrated that the older parks belonging to or surrounding the San Francisco trading area were already full prior to 1971, the opening date of the Franciscan. At the same time, it was shown that the Franciscan was an outstanding five-star park. It had large spaces and full recreational facilities, and was the only park close to San Francisco that had double-wide spaces available. The evidence

as a whole leaves no doubt that the Franciscan was a unique park, both because of its location and superb facilities.

The record is replete with evidence that the exclusion of Suburban from the Franciscan resulted in considerable actual and/or potential loss of profit to appellant. Thus, it was shown that Suburban had a waiting list of customers for the Franciscan; that there were numerous prospects (half a dozen a week) who wanted mobilehomes in the Franciscan; and that there were a number of concrete sales or potential sales which were lost because of the unavailability of mobilehome sites in the Franciscan to the Suburban customers. In addition, it was statistically demonstrated that while Suburban filled 90 to 95 percent of the mobilehome park vacancies in northern San Mateo County from 1971 to 1975, in the disputed period it could sell only 6 mobilehomes of the total of 253 sales in the park.

Based upon the foregoing facts, appellant brought an action against respondents charging multiple violation of the Cartwright Act, including an illegal restraint of trade and an illegal tie-in arrangement (§§ 16720, 16726, 16727). Upon the conclusion of Suburban's evidence, the trial court refused to submit the case to the jury and granted respondents' motion for nonsuit. In accordance therewith, judgment was entered as to all causes of action in favor of respondents. The appeal is taken from the judgment.

Appellant contends on appeal that the trial court erred in granting respondents' motion for nonsuit, because the evidence of record supports the elements of an illegal tie-in arrangement which constitutes a per se violation of the Cartwright Act (§§ 16720, 16726, 16727). In the alternative, appellant argues that the evidence is sufficient to prove a restraint of trade under the "rule of reason" standard (§ 16720; *Standard Oil Co. v. United States* (1911) 221 U.S. 1 [55 L.Ed. 619, 31 S.Ct. 502]; *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 930 [130 Cal.Rptr. 1, 549 P.2d 833]), even if the preconditions of an unlawful tying arrangement or agreement are absent. We are persuaded that respondents' conduct, as reflected by the evidence, clearly amounts to an illegal tying arrangement which, under well established case law, constitutes a per se violation of both the federal antitrust law (Sherman Act, 15 U.S.C. § 1 et seq.) and the California Cartwright Act (§§ 16720, 16726). Accordingly, we are compelled to reverse the judgment.

■ Before discussing appellant's contention on the merits, we underline a few important preliminary matters. First is the legal principle under which a nonsuit may be granted. It has become the established law of this state that a nonsuit or directed verdict may be granted only where, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff (*O'Keefe v. South End Rowing Club* (1966) 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]; *Morgenroth v. Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 530 [126 Cal.Rptr. 681]). Neither the appellate court nor the lower court may weigh the evidence or consider the credibility of the witnesses (*Lasry v. Lederman* (1957) 147 Cal. App.2d 480 [305 P.2d 663]). Plaintiff may rely on that portion of testimony which is favorable to him and disregard the unfavorable portions (*Anthony v. Hobbie* (1945) 25 Cal.2d 814 [155 P.2d 826]). Unless it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the court is not justified in taking the case from the jury (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; *Umsted v. Scofield Eng. Const. Co.* (1928) 203 Cal. 224, 228 [263 P. 799]).

The second point is that summary proceedings are not favored in antitrust suits. ■ As the court put it in *Poller v. Columbia Broadcasting* (1962) 368 U.S. 464, 473 [7 L.Ed.2d 458, 464, 82 S.Ct. 468], "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." (See also *Fortner Enterprises v. U.S. Steel* (1969) 394 U.S. 495, 500 [22 L.Ed.2d 495, 503, 89 S.Ct. 1252]; *Santa Clara Valley Distributing v. Pabst Brewing* (9th Cir. 1977) 556 F.2d 942, 944-945.)

■ Finally, it has been widely recognized that sections 16720 and 16726 of the Cartwright Act were patterned after the Sherman Act (15 U.S.C. § 1 et seq.), and both statutes have their roots in the common law (*Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953]). Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act (*Marin County Bd. of Realtors, Inc.*

v. *Palsson, supra,* 16 Cal.3d 920, 925; *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481]; *Sherman* v. *Mertz Enterprises* (1974) 42 Cal.App.3d 769, 775 [117 Cal.Rptr. 188]). With these preliminary considerations in mind, next we set out the legal principles governing the tying agreements or arrangements and apply them to the facts of the instant case.

■ Both the Sherman Act and its California equivalent, the Cartwright Act, prohibit every contract, combination or trust which is formed for the purpose of restraining trade or commerce.[2] Although the statutory language prohibiting restraints on trade or commerce is couched in all-encompassing terms in both acts, each has been interpreted by the courts to ban only unreasonable restraints (*Standard Oil Co. v. United States, supra,* 221 U.S. 1, 60 [55 L.Ed. 619, 645]; *People v. Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719, 727 [264 P.2d 31]). However, as the United States Supreme Court put it in *Northern Pac. R. Co. v. United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549-550, 78 S.Ct. 514], "*there are certain agreements or practices which because of their pernicious effect on competition* and lack of any redeeming virtue *are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused* or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. *Among the practices*

---

[2]15 United States Code section 1 (Sherman Act) provides in part that "*Every contract, combination in the form of trust* or otherwise, or conspiracy, *in restraint of trade or commerce...is* declared to be *illegal.*"

Section 16720 of the Cartwright Act sets out in relevant part that "*A trust is a combination of capital, skill or acts* by two or more persons for any of the following purposes:

"(a) *To create or carry out restrictions in trade or commerce.*

"(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.

"(c) *To prevent competition in* manufacturing, making, transportation, *sale or purchase of merchandise, produce or any commodity.*" (Italics added.)

Section 16726, in turn, reads that "Except as provided in this chapter, *every trust is unlawful, against public policy and void.*" (Italics added.)

*which the courts have heretofore deemed to be unlawful in and of themselves are* price fixing [citation]; division of markets [citation]; group boycotts [citation]; and *tying arrangements* [citation]." (Italics added.)

■ For the purposes of antitrust violation, a tying arrangement is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed." (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. at pp. 5-6 [2 L.Ed.2d at p. 550]; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d at p. 856.) The evil accompanying the tying arrangement is described as follows: "'[T]ying agreements serve hardly any purpose beyond the suppression of competition.' *Standard Oil Co. of California* v. *United States,* 337 U.S. 293, 305-306. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' *Times-Picayune Publishing Co.* v. *United States,* 345 U.S. 594, 606." (*Northern Pac. R. Co.* v. *United States, supra.*) Tying arrangements are illegal per se "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product..." (*Northern Pac. R. Co.* v. *United States, supra* at p. 6 [2 L.Ed.2d at p. 550]), and when "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis,* is foreclosed to competitors by the tie." (*Fortner Enterprises* v. *U. S. Steel, supra,* 394 U.S. at p. 501 [22 L.Ed.2d at p. 504].)

■ In sum, in order to prove an illegal per se tying arrangement there must be a showing that: (1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; and (3) a substantial amount of sale was effected in the tied product. Lastly, since the antitrust violation is a species of tort, (4) the complaining party must prove that he suffered pecuniary loss as a consequence of the unlawful act (*Beegle* v. *Thomson* (7th Cir. 1943)

138 F.2d 875, 881; *Alberto-Culver Company* v. *Andrea Dumon, Inc.* (N.D. Ill. 1969) 295 F.Supp. 1155, 1157; *McCormack* v. *Theo. Hamm Brewing Co.* (D.Minn. 1968) 284 F.Supp. 158, 164). ■ As will be demonstrated below, all four conditions enumerated above find abundant support in the record which is but another way of saying that appellant made out a prima facie case for the consideration of the jury under the doctrine of an illegal tying arrangement.

(a) *Existence of Tying Arrangement*: As noted earlier, the existence of a tying arrangement between AMFAC and the four participating mobilehome dealers (including respondents Instant, R & A and S & S) was evidenced first by the December 29, 1971, agreement which explicitly put aside and reserved 288 out of 501 home sites in the park for those dealers who displayed their mobilehomes in the Franciscan and who, under the terms of other agreements and understandings, were bound to pay monetary contribution to AMFAC after each coach that was sold in the park. In addition to the written agreements, there is a host of evidence showing that the restrictive policy agreed upon by the parties was strictly carried out in the every day practice. For example, Instant told people coming to see its mobilehome display that it would be necessary to purchase the home from it or other dealers in the area (not Suburban) if they wanted a space in the Franciscan. Mr. Cole, the park manager of AMFAC, also advised people that reservations in the park were up to the management, and that anyone reserving a space for his mobilehome would have to purchase the home from one of the dealers who displayed homes in the park. Mr. O'Neil, the sales representative of R & A, likewise admitted that when people came to the Franciscan they were told that they must buy through one of the displaying dealerships (most specifically through R & A) if they wanted to get a home site in the park. The above testimonies were reaffirmed by individual home buyers as well. Thus, Mr. Bishop testified that although he wanted to buy a mobilehome from Suburban, he was told by Instant that only certain dealers could get their homes on the Franciscan spaces. Mrs. Varni, who had already made a deposit in order to purchase a mobilehome from Suburban, rescinded the deal and bought her coach from R & A, upon learning from AMFAC that only those people could move into the park who bought their homes from one of the participating dealers. Finally, the February 27, 1972, advertisement published in the San Francisco Chronicle also made it clear that the potential buyers had to select their home from the mobilehomes on display in the park.

(b) *Economic Power of AMFAC:* Before resorting to the record to show that AMFAC possessed sufficient economic power to impose an appreciable restraint on the free competition of the tied product (here, mobilehomes), we emphasize that the power over the tying product (here, home sites) can be sufficient even though the power falls short of dominance and even though the power exists only with respect to some buyers in the market. As the cases unanimously underline, such crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes (*United States* v. *Loew's, Inc.* (1962) 371 U.S. 38, 45 [9 L.Ed.2d 11, 18, 83 S.Ct. 97]; *Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. at p. 503 [22 L.Ed.2d at p. 505]; *Lessig* v. *Tidewater Oil Company* (9th Cir. 1964) 327 F.2d 459, 470).

 In the case at bench, the evidence demonstrates that the Franciscan was both desirable and unique within the meaning of the aforestated rule. As mentioned earlier, the Franciscan had an excellent location attracting many potential mobilehome customers in the San Francisco Bay Area. The other parks within commuting distance of San Francisco (i.e., in San Mateo, Santa Clara, Alameda, Contra Costa and Marin Counties), with a few exceptions, were filled at the time the Franciscan opened in 1972. The desirability of the Franciscan was demonstrated inter alia by the fact that Suburban had a backlog of customers waiting for spaces in the Franciscan, and that dozens of other customers expressed their interest in placing their mobilehomes in the Franciscan. At the same time, the Franciscan was not only highly desired but also unique. As pointed out earlier, it was a first-class park with large sites and full recreational facilities, including swimming pools. Moreover, it was the only park close to and within commuting distance of San Francisco that had spaces for double-wide coaches sold by Suburban.

(c) *Substantiality of Sales:* The record is also revealing with respect to the third element of an illegal tie-in arrangement, that is the requisite of a substantial volume of sales in the tied product. A short summary of the pertaining evidence discloses that the sale of mobilehomes was tied up as to 288 spaces out of 501. The data presented at the trial substantiate that appellant's rivals took full advantage of the illegal tying agreement. Out of the 253 sales effected in the park, 247 were made by appellant's competitors (113 by R & A, 62 by Instant, 51 by S & S, and 16 all others), and appellant was able to sell only 6 mobilehomes out of the total of 253. Considering the circumstance that

in the period in question the sales price of single-wide mobilehomes ranged from $7,000 to $12,000, and the double-wides from $10,000 to $20,000, even taking a low average of $10,000 per coach, the amount of sales in the tied product exceeds $2.5 million. This volume of sales, of course, cannot be considered insubstantial or de minimis, especially in light of the case law which held that the sum of $60,800 was regarded to be a not insubstantial amount of commerce in *United States* v. *Loew's, Inc., supra*, 371 U.S. 38, 49 [9 L.Ed.2d 11, 20-21], and likewise the sum of almost $200,000 was not looked upon as "paltry or 'insubstantial'" in *Fortner Enterprises* v. *U. S. Steel, supra*, 394 U.S. 495, 502 [22 L.Ed.2d 495, 504].

(d) *Proof of Damages*: We are equally satisfied appellant provided sufficient proof that as a result of the illegal tying arrangement it suffered considerable loss by virtue of loss of profit. ■ In this connection, it bears emphasis that in antitrust cases the common law rules of damages are not controlling. While, similar to other cases, damages cannot be awarded in antitrust cases upon sheer guesswork or speculation, the plaintiff seeking damages for loss of profits is required to establish only with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of the anticipated revenue (*Flintkote Company* v. *Lysfjord* (9th Cir. 1957) 246 F.2d 368, 392). Once that has been accomplished, the jury will be permitted to act upon probable and inferential proof and to "make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." (*Bigelow* v. *RKO Radio Pictures* (1946) 327 U.S. 251, 264 [90 L.Ed. 652, 660, 66 S.Ct. 574].) ■ This is in line with the California authorities which emphasize that while the plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of the defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult to ascertain with precision (*Stott* v. *Johnston* (1951) 36 Cal.2d 864, 875 [229 P.2d 348, 28 A.L.R.2d 580]). On the contrary, the law only requires that some reasonable basis of computation be used and will allow damages so computed even if the result has been reached by way of approximation (*Allen* v. *Gardner* (1954) 126 Cal.App.2d 335, 340 [272 P.2d 99]). And where, as here, the operation of an established business was prevented or interrupted by the tort of the defendants, it has been held that the loss of prospective profits may be proven by the past volume of business and other provable data relevant to the probable future sales (*Grupe* v.

Glick (1945) 26 Cal.2d 680, 692 [160 P.2d 832]; Gainer v. Storck (1959) 169 Cal.App.2d 681, 687-688 [338 P.2d 195]).

 Appellant here established with reasonable certainty the required causal connection between respondents' wrongful conduct and its business loss suffered as a result of such conduct, and also provided sufficient relevant data upon which the extent of its lost profit may be ascertained by the jury by way of a reasonable estimate or approximation. To begin with, appellant introduced proof that as a consequence of the restrictive practices of respondents, its share in the mobilehomes sales was drastically reduced in 1972. Thus, it was shown that while previously Suburban was one of the most successful mobilehome dealers in the area capturing the lion's share of the market (90-95 percent of sales in northern San Mateo County and 50-60 percent of sales in the Pacific Skies Estate in Pacifica), it sold but a minimal 2.37 percent of mobilehomes in the Franciscan in 1972. Moreover, appellant introduced concrete evidence as to individual losses suffered as a result of the oppressive sales policy of the respondents. The most notable of these instances were the loss of sale or potential sale to Bracato, Sinnard, Bishop, Ellis, Scott, Madrone, and Varni. Finally, Mr. Brayshaw, who was employed by Suburban as a salesman from 1971 to 1975, testified that as many as half a dozen prospects a week told him that they could not buy a mobilehome from him for use in the Franciscan. If the aforesaid evidence is considered together with the testimony of Mr. Fischer, the president of Suburban, who explained that the net profit on a single-wide mobilehome was about $1,500, and about $2,100 on a double-wide coach, it becomes clear that the jury was provided with a solid basis upon which to calculate or at least estimate the amount of damages incurred by the appellant.

Although the foregoing discussion leaves no doubt that appellant made out a prima facie case of an illegal per se tying arrangement which should have been submitted to the jury for proper consideration and resolution, respondents nonetheless insist that the granting of nonsuit was proper in the present case because: (1) appellant failed to introduce evidence as to the relevant geographic market; (2) an actionable tying arrangement requires that both the tying product and the tied product be sold or leased by the same entity; (3) the proof of damages was inadequate; and (4) appellant failed to introduce evidence to prove actual exercise of economic power—coercion. We find no merit in any of these contentions.

██ Respondents' first argument, that the delineation or proof of the relevant geographic market is a *conditio sine qua non* to the establishment of an actionable tying arrangement, flies directly in the face of well settled law. As pointed out earlier, the standard of illegality under the tying theory is that the seller must have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product..." (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. at p. 6 [2 L.Ed.2d at p. 550]). Consistently therewith, it has been amplified that "*The requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market* or to the share of that market foreclosed by the tie" (*Fortner Enterprises* v. *U. S. Steel, supra,* 394 U.S. at p. 501 [22 L.Ed.2d at pp. 503-504]); and that "Since the requisite economic power may be found on the basis of either uniqueness or consumer appeal, and since market dominance in the present context does not necessitate a demonstration of market power..., it should *seldom be necessary in a tie-in sale case to embark upon a full-scale factual inquiry into the scope of the relevant market* for the tying product and into the corollary problem of the seller's percentage share in that market." (*United States* v. *Loew's, Inc., supra,* 371 U.S. at p. 45, fn. 4 [9 L.Ed.2d at p. 18].) (Italics added.) Indeed, the requisite control of the tying product may be inferred from the seller's success in imposing a tying condition upon a substantial amount of commerce in the tied product without any further reference to the market (*Lessig* v. *Tidewater Oil Company, supra,* 327 F.2d 459, 469).

██ Respondents' next contention is also mistaken. It has been established that an illegal tying arrangement does not require that one party or entity offer both the tying product and the tied product. Contrary to respondents' assertion, such violation may be found if the offeror of the tying product has an economic interest in the tied product, even though the latter is manufactured or otherwise produced by another party or entity.

The leading case dealing with that very issue is *Osborn* v. *Sinclair Refining Company* (4th Cir. 1960) 286 F.2d 832. In *Osborn,* defendant Sinclair, an oil refining company, entered into an agreement with Goodyear Tire and Rubber Company. Under the terms of the arrangement Sinclair agreed to sell and promote Goodyear tires, batteries and accessories through its filling station operators and in exchange Goodyear agreed to pay 5-10 percent commission to Sinclair on the Goodyear merchandise sold. In order to carry out the agreement, Sinclair imposed

upon its filling station dealers the requirement that they purchase a certain quantity of Goodyear products and conditioned the continued sale of gasoline to them on the purchase of Goodyear merchandise. Osborn, a filling station operator who was terminated because of failing to purchase sufficient quantities of Goodyear tires, batteries and accessories, brought an antitrust suit against Sinclair, charging that the conduct in question constituted an unlawful tying arrangement under the Sherman Act. The court found for the plaintiff and held that the tying arrangement in question was illegal per se, because it involved a not insubstantial amount of commerce. As to the contention that the tying and tied products were not produced or sold by the same entity and therefore a crucial element of an illegal tie-in was lacking, the court had the following to say: "The perniciousness of the imposed tie-in is aggravated by the fact that the defendant is not even in the business of selling the tied products, but is employing its economic power in the gasoline industry to force his dealers to do business with a supplier in another industry under *an arrangement that yields the defendant an extraneous revenue.* The defendant in this case goes a step further than the supplier in the usual tie-in case, for here the tied product is not even handled or sold by the defendant, but it farms out to another, for a price, its coercive economic power." (*Osborn* v. *Sinclair Refining Company, supra,* pp. 839-840, italics added.)

*Osborn* is on all fours with the case at bench. Similar to Sinclair, AMFAC, the owner of the tying product, exerted its coercive economic power to restrict the trade of mobilehomes (the tied product) sold by third parties in return for extra benefit extorted from the latter parties. Consequently, what has been said in *Osborn,* is equally applicable to the present case.

We note in passing that *Crawford Transport Company* v. *Chrysler Corporation* (6th Cir. 1964) 338 F.2d 934, and *Nelligan* v. *Ford Motor Company* (W.D.S.C. 1958) 161 F.Supp. 738, upon which respondents primarily rely, are clearly distinguishable from *Osborn.* The crucial distinguishing factor is that unlike in *Osborn* (and the case at bench), the seller of the tying product did not receive direct benefit from the tying arrangement in either *Crawford* or *Nelligan.*

Respondents' third claim, that the evidence of loss produced by appellant was inadequate, has been fully discussed and answered in the previous chapter and requires no repeated elaboration here.

Respondents' fourth claim is that there was no evidence introduced to show that AMFAC utilized economic power to *coerce* an appreciable number of lessees of mobilehome spaces to purchase mobilehomes from the participating dealers. This contention is without merit. "Coercion occurs when the buyer must accept the tied item and forego possibly desirable substitutes." (*Moore* v. *Jas. H. Matthews & Co.* (9th Cir. 1977) 550 F.2d 1207, 1217.) As discussed previously in relation to the existence of a tying arrangement, the record makes it abundantly clear that many buyers had to accept the tied product and forego possibly desirable substitutes.

This brings us to two more unresolved questions. One is whether in the circumstances of the present case an unlawful tying arrangement can arise also under section 16727.[3] This question gains some significance because the burden of proving an illegal tying arrangement differs somewhat under section 16720 and section 16727. Under section 16727 the plaintiff must establish that the tie-in substantially lessens competition. This standard is met if *either* the seller enjoys sufficient economic power in the tying product to appreciably restrain competition in the tied product *or* if a not insubstantial volume of commerce in the tied product is restrained. Under section 16720 standard, both conditions must be met (*MDC Data Centers, Inc.* v. *International Bus. Mach. Corp.* (E.D. Pa. 1972) 342 F.Supp. 502, 504).

In addressing the merit of the issue, we agree with respondents that section 16727 is based on section 3 of the Clayton Act (15 U.S.C. § 14), hence federal decisions interpreting section 3 of that act are applicable (*Chicago Title Ins. Co.* v. *Great Western Financial Corp., supra,* 69 Cal.2d at p. 315). The federal cases, in turn, explain that the statutory word "commodities" in section 3 of the act pertains only to goods, wares, merchandise, machinery, supplies and other similar movable items which do not include land (*Baum* v. *Investors Diversified Services, Inc.* (7th Cir. 1969) 409 F.2d 872, 875; *United States* v. *Investors Diversified Services* (D.Minn. 1951) 102 F.Supp. 645, 648). It

---

[3]Section 16727 reads that "It shall be unlawful for any person to lease or make a sale or contract for the sale of *goods, merchandise, machinery, supplies, commodities for use within the State,* or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Italics added.)

is well to remember that in the case at bench the tying product is not a movable item but rather is land, more specifically, lease of land. It thus falls squarely within *N.W. Controls, Inc.* v. *Outboard Marine Corporation* (D.Del. 1971) 333 F.Supp. 493, 500, where the court held that "*If the tie does not involve a commodity but concerns land,* services or credit, which do not fit the Clayton Act's language, *it is governed by the Sherman Act* and the plaintiff is required to bear the additional burden of proving that the defendant's economic power with respect to the tying product is sufficient to produce an appreciable restraint." (Italics added.) *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d 920, cited by appellant, does not control the situation here. In *Palsson,* the word "commodity" was interpreted under section 16720, the equivalent of section 1 of the Sherman Act, and as a consequence it did not cover section 16727 which is governed by the Clayton Act and the case interpretation thereunder.

Turning to the last issue, we note appellant's contention that it is entitled to recover also under the "rule of reason" theory has been raised only as an alternative if we would find that the elements of an unlawful tie-in have not been established. Since we have concluded that appellant has made out a prima facie case of an actionable tying arrangement under section 16720, the complex issues raised in appellant's alternative argument need not be reached.

That portion of the judgment granting a nonsuit as to the tie-in cause of action is reversed; in all other respects the judgment is affirmed.

Taylor, P. J., and Miller, J., concurred.

Respondents' petitions for a hearing by the Supreme Court were denied April 17, 1980.