**CCBN.COM, INC., Plaintiff,**

v.

**THOMSON FINANCIAL, INC., Defendant.**

No. CIV.A.02–11532 PBS.

United States District Court, D. Massachusetts.

July 2, 2003.

Knight, Tory A. Weigand, Morrison, Mahoney, & Miller LLP, Boston, Andrew Kaizer, Wilmer, Cutler & Pickering, New York, NY, Michael Klein, Robert Hoyt, Christopher Davies, Michael R. Klein, Wilmer, Cutler & Pickering, Washington, DC, Steven F. Cherry, Wilmer, Cutler & Pickering, James W. Frost, Wilmer, Cutler & Pickering, Washington, DC, for CCBN. COM, Plaintiff.

Anthony S. Fiotto, Goodwin Procter, LLP, Boston, Martin Flumenbaum, Alex Young K. Oh, John W.R Murray, Paul, Weiss, Rifkind, Wharton & Garrison, Henry Seiji Newman, Paul, Weiss, Rifkind, Wharton & Garrison, Aidan Synnott, Pauli, Weiss, Rifkind, Wharton, & Garrison, New York, NY, for Thomson Corporation, Thomson Financial, In, Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff CCBN.com Inc. ("CCBN") alleges that defendant Thomson Financial, Inc. breached its fiduciary duty to plaintiff, violated the antitrust laws, and engaged in a host of other statutory and common law transgressions.[1] The defendant has moved, on numerous grounds, to dismiss all claims. After hearing and briefing, the motion to dismiss is *ALLOWED* in part and *DENIED* in part.

### II. ALLEGED FACTS

The complaint alleges the following facts.

Joseph J. Samarias, Wilmer, Cutler & Pickering, Washington, DC, Peter C.

1. After wading through the 19 separate counts of the original everything-but-the-kitchen-sink complaint, and while finalizing the opinion, I received the First Amended Complaint. Courtesy suggests that counsel should have informed the Court that an amended complaint was on the way.

CCBN is a Delaware corporation, currently headquartered in Boston, Massachusetts. In 1997, CCBN began to market an internet-based calendaring and webcasting service—called "StreetEvents"—to Investor Relations ("IR") departments of companies that employ such services as part of their investor outreach programs. Defendant Thomson Financial, a New York corporation, sells investment information services, including its signature "First Call" aggregation of analyst reports on publicly traded companies, to a wide range of clients such as investment banks, institutional investors, and brokers.

In October 1997, CCBN's founders invited Thomson Financial to become an investor in CCBN. This would not be the first business deal between the parties. Jeffrey Parker, one of the founders of CCBN, had started two information services companies in the early 1980s and sold both to Thomson in 1986. Those companies became the foundation of Thomson Financial. CCBN envisioned that the synergies between CCBN and Thomson Financial, as well as the past relationship between the parties, would make for a successful partnership in CCBN's IR venture.

A deal between the two companies was consummated in October 1997. Thomson Financial invested $1.5 million in CCBN, acquiring a 13 percent equity interest in the company. As a condition of that investment, Thomson Financial obtained the right to designate two of the five members of CCBN's Board of Directors. CCBN and Thomson Financial also agreed that CCBN would have the exclusive right to publish Thomson Financial's First Call consensus estimates on its customers' IR web pages, and that Thomson Financial would be entitled to receive information periodically from CCBN, through Thomson Financial's Board representatives and informally through CCBN management,

regarding the development of CCBN's business.

After Thomson Financial's investment, CCBN viewed Thomson Financial as a strategic business partner. Believing that the two companies had an agreement that Thomson Financial would not compete with CCBN in the provision of IR communication services, CCBN openly shared with Thomson Financial extensive proprietary information, including the organization and structure of its content, customer data, and analyses of customer strengths and weaknesses.

In 2000, Thomson Financial began to use confidential CCBN information, obtained by Thomson Financial representatives on CCBN's board, to openly compete with CCBN in various ways. First, Thomson Financial board members employed numerous delaying tactics to stall CCBN's planned expansion into the European market. Second, various Thomson Financial officials encouraged plaintiff to delay the introduction of new investment products, such as an "intelligence dashboard" tab on its popular "StreetEvents" service, in order to give Thomson Financial time to develop products to compete directly with CCBN. The intelligence dashboard tab would have provided CCBN clients with detailed and easily accessible information concerning shareholder targeting data, trading volume, and analyst estimates. Third, Thomson Financial misappropriated CCBN corporate opportunities, and interfered with prospective business arrangements of CCBN, using information obtained from Thomson Financial board members. Fourth, Thomson Financial used confidential information obtained in its role as a CCBN fiduciary to launch "First Call Events," an IR product that provides services that are virtually identical to CCBN's StreetEvents calendar. To advance its efforts to compete with CCBN,

Thomson Financial also used passwords it had obtained in connection with its service on CCBN's board to access CCBN's computer systems.

## III. MOTION TO DISMISS STANDARD

For purposes of this motion, the Court takes as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in [her] favor." *Coyne v. City of Somerville,* 972 F.2d 440, 442–43 (1st Cir.1992) (citing *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990)). A complaint should not be dismissed under Fed. R.Civ.P. 12(b)(6) unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.' " *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## IV. LEGAL ANALYSIS

### A. Breach of Fiduciary Duty—Board Representation (Count 1)

■ Defendant claims that CCBN has failed to allege facts sufficient to support its breach of fiduciary duty claims. Under the law of Delaware [2], the state of incorporation, a minority shareholder is not a fiduciary of a corporation unless it exercises actual control over the corporation. "[A] shareholder holding less than a 50% interest is not a controlling shareholder, with the fiduciary obligations accompanying that status, unless the shareholder exercises actual control over the conduct of the corporation." *In re Healthco Int'l Inc.,* 203 B.R. 515, 518 (Bankr.D.Mass.

1996) (applying Delaware law). The right to appoint a minority of the board members does not, without more, demonstrate a minority shareholder's control of the corporation. *Id.*

■ Nonetheless, CCBN argues that Thomson Financial is liable under the doctrine of respondeat superior for the breach of fiduciary duty by its own employees and former executives who sat on CCBN's board. *See generally* RESTATEMENT (SECOND) OF AGENCY §§ 140, 212 (1958). While this is an interesting theory, courts applying Delaware law have rejected it. *See U.S. Airways Group, Inc. v. British Airways PLC,* 989 F.Supp. 482, 494 (S.D.N.Y. 1997) ("[T]he imposition of respondeat superior liability on a corporation for breach of fiduciary duty by its directors on the board of another corporation would completely undermine Delaware corporate law, which limits such fiduciary duty to majority and controlling shareholders."); *cf. Medical Self Care, Inc. v. National Broadcasting Company, Inc.,* 01–CIV–4191, 2003 WL 1622181, *7 (S.D.N.Y. March 28, 2003) (citing *US Airways Group* and rejecting theory under California law); *but see In re Papercraft Corp.,* 165 B.R. 980, 991 (Bankr.W.D.Pa.1994) (accepting theory in case applying Pennsylvania law), *vacated on other grounds,* 187 B.R. 486 (Bankr. W.D.Pa.1995), *rev'd on other grounds,* 211 B.R. 813 (W.D.Pa.1997).

■ Plaintiff also relies on *Blau v. Lehman,* 368 U.S. 403, 410, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962) in which the Supreme Court held that for the purposes of determining director liability under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), the federal insider-trading statute, a corporation that "deputizes"

---

**2.** "It is well settled that internal corporate affairs are governed by the law of the state of incorporation (Delaware)." *Micro Networks*

*Corp. v. HIG Hightec, Inc.,* 195 F.Supp.2d 255, 255 n. 1 (D.Mass.2001).

a representative to serve as a director of another corporation could itself be considered a director. While *Blau* has been influential in the application of § 16(b), *see, e.g. Feder v. Martin Marietta Corp.,* 286 F.Supp. 937, 941–42 (S.D.N.Y.1968), it has not been extended in Delaware to impose liability on a corporation for a breach of fiduciary duty by its representative on a board of directors. I decline to create a novel theory of liability under Delaware law. As the First Circuit has stated, "in diversity cases the federal courts do not undertake to restructure state law." *Howse v. Zimmer Mfg. Co. Inc.,* 757 F.2d 448, 451 (1st Cir.1985). Plaintiff's claim based on respondeat superior must therefore be rejected.

CCBN has a comeback argument that Thomson is liable for joining with a fiduciary in a breach of her fiduciary duties. Under Delaware law, "one who knowingly joins with a fiduciary, including corporate officials, in a breach of a fiduciary obligation is liable to the beneficiaries of the trust relationship." *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1344 (Del.1987). The elements of an aiding and abetting claim are: " '(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendant[ ], and (4) damages proximately caused by the breach." *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del. 2001).

As directors on CCBN's board, Thomson Financial's designees owed a fiduciary duty to CCBN. *See Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1172 (Del. 2000) ("Directors of Delaware corporations are fiduciaries who owe duties of due care, good faith and loyalty to the company and its stockholders."). These designees allegedly passed along confidential information about CCBN's business to Thomson Financial. If the directors knew it would be used to compete with CCBN, they would be violating their fiduciary duty to CCBN. *See Cede & Co. v. Technicolor,* 634 A.2d 345, 361 (Del.1993) (describing the fiduciary duty "not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation") (quoting *Guth v. Loft Inc.,* 5 A.2d 503, 510 (Del.1939)). Similarly, if Thomson Financial knew that its representatives violated their fiduciary duty when they provided this confidential information, it would be liable for aiding and abetting a breach of fiduciary duty. *See Malpiede,* 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."). While plaintiff has briefed the aiding-and-abetting theory, the amended complaint itself does not specifically assert it as a separate theory of recovery, or specifically assert the factual allegations necessary to support the claim. Accordingly, the motion to dismiss claim one is *ALLOWED* without prejudice to repleading within thirty days.

### B. Breach of Fiduciary Duty—Joint Venture Relationship (Count 2)

CCBN next contends that Thomson Financial owes a fiduciary obligation to CCBN through the existence of a relationship of trust and confidence between the parties. Defendant contends that plaintiff fails to plead facts demonstrating that the parties' relationship was anything other than an ordinary, arms length business relationship.

Under Delaware law, "the existence of a fiduciary relationship requires one party reposing, to a second party's knowledge, trust and confidence in the sec-

ond party." *KBQ, Inc. v. E.I. du Pont de Nemours & Co.,* 6 F.Supp.2d 94, 100 (D.Mass.1998) (applying Delaware and Massachusetts law). However, "[a] conventional business relationship does not create a fiduciary relationship in the absence of additional factors." *RKB Enters., Inc. v. Ernst & Young,* 182 A.D.2d 971, 972, 582 N.Y.S.2d 814 (N.Y.App.Div.1992); *see also Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.,* 696 F.Supp. 57, 75 n. 16 (D.Del.1988) (collecting cases declining to recognize a fiduciary relationship between sophisticated parties dealing with one another at arms length). Such "additional factors" may involve a particular vulnerability or susceptibility to overreaching on the part of one of the parties. *See Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 944 F.Supp. 986, 996 (D.Mass. 1996) (noting that a "fiduciary duty arise[s] out of a relationship of vulnerability").

■ Numerous allegations suggest a relationship of "trust and confidence" between CCBN and Thomson Financial that goes well beyond a conventional business relationship. Among other things, Thomson Financial had a long standing close business relationship with CCBN, made various representations to encourage a relationship of confidence, had designees on the Board of Directors, shared confidential information, and was negotiating a joint venture. *See Industrial General Corp. v. Sequoia Pacific Systems Corp.,* 44 F.3d 40, 44 (1st Cir.1995) ("The question of whether, in a particular factual setting, a fiduciary relationship exists is a question of fact."). The motion to dismiss Count 2 is *DENIED.*

## C. Sherman Act Claims (Counts 7–10)

The First Amended Complaint alleges four separate antitrust counts under the Sherman Act, 15 U.S.C. §§ 1–2 (2000). Plaintiff argues: (1) that Thomson Financial required customers who wanted to purchase Thomson Financial's "Aggregated Research" product to also purchase its "Aggregated Calendar" product, in violation of § 1 of the Sherman Act; (2) that Thomson Financial required purchasers of Thomson Financial's "First Call Consensus Estimate" to also purchase its "Aggregated Calendar" product, also in violation of § 1 of the Sherman Act; (3) that Thomson Financial engaged in a pattern of illegal conduct in an effort to drive CCBN from the market for IR calendaring services, resulting in a dangerous probability of Thomson Financial obtaining a monopoly position in that market, in violation of § 2 of the Sherman Act; and (4) that Thomson Financial engaged in a pattern of misconduct that has resulted in Thomson Financial's monopolization of the IR calendaring market, also in violation of § 2 of the Sherman Act.

### 1. The Section 1 Claims

■ Section 1 of the Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ...." 15 U.S.C. § 1. Courts have analyzed some kinds of § 1 illegal restraint claims under a "rule of reason" inquiry, and others under *"per se"* rules. "As its name suggests, the rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). "The costs of judging business practices under the rule of reason, however, have been reduced by the recognition of *per se* rules. Once experience with a particular kind of restraint

enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." *Id.* at 333–34, 102 S.Ct. 2466. There is, however, "often no bright line separating per se from Rule of Reason analysis." *National Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Oklahoma,* 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). "[W]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *Id.* at 104, 104 S.Ct. 2948. CCBN presses its tying claims under both *per se* and rule of reason theories.

■■■ Courts have identified some tying arrangements as *per se* violations of the Sherman Act. *See Maricopa County Med. Soc'y,* 457 U.S. at 344 n. 15, 102 S.Ct. 2466 (citations omitted); *see also Data General Corp. v. Grumman Systems Support Corp.,* 36 F.3d 1147, 1178 (1st Cir. 1994) ("Section 1 of the Sherman Act prohibits a seller from 'tying' the sale of one product to the purchase of a second product if the seller thereby avoids competition on the merits of the 'tied' product."). The First Circuit has identified four elements of a *per se* tying claim:

> (1) the tying and the tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product.

*Borschow Hospital and Medical Supplies, Inc. v. Cesar Castillo Inc.,* 96 F.3d 10, 17 (1st Cir.1996) (citations omitted).

■■ The complaint makes adequate allegations that the two products at issue are distinct products. The Aggregated Calendar product (the tied product) provides information from individual companies about their own events and schedules. As described, such a service is not interchangeable with Aggregated Research or Consensus Estimate products (the tying products), which are independent analyses of the financial strength of publicly traded companies. Defendant disputes the contention that these are distinct products. Nonetheless, at this stage of the litigation, sufficient allegations concerning the first element of the tying claim have been made.

With respect to the second element, defendant argues that plaintiff has not set forth adequate factual allegations concerning the existence of "an agreement or condition, express or implied, that establishes a tie." *Borschow Hospital,* 96 F.3d at 17. The complaint states that "[u]pon information and belief, THOMSON FINANCIAL has required customers who wish to purchase THOMSON FINANCIAL's Aggregated Research to also purchase Thomson FINANCIAL's Aggregated Calendar." (Am.Compl.¶ 100.) Plaintiff references no contract that would implicate such a tying arrangement. Nor does the amended complaint name any customers or provide any allegations which, if proved true, could substantiate the existence of an informal or implied illegal tying arrangement.

■■■ Even under notice pleading standards, as framed, the complaint does nothing more than parrot the second element of the tying claim and assert that "on information and belief" it is implicated here. While no special pleading standards attach to antitrust claims, plaintiffs must do more than assert conclusory allegations. *See DM Research, Inc. v. College of Amer-*

*ican Pathologists,* 170 F.3d 53, 57 (1st Cir.1999) (dismissing § 1 Sherman Act claim because plaintiff failed to "allege[ ] *facts* indicating an agreement—instead of merely asserting a conspiracy in conclusory terms") (emphasis in original); *Garshman v. Universal Resources Holding,* 824 F.2d 223, 230 (3d. Cir.1987) (dismissing § 1 Sherman Act claim, stating: "The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act.") (citations omitted); *Five Smiths, Inc. v. National Football League Players Association,* 788 F.Supp. 1042, 1048 (D.Minn. 1992) (dismissing § 1 Sherman Act claim where "the complaint is devoid of any allegation as to the nature of any such agreement, the parties to such an agreement and the way in which the alleged agreement operated").

 Even if this "information and belief" allegation were sufficient, defendant also emphasizes plaintiff's failure to adequately allege the third element of the claim, that defendant Thomson Financial "has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product." *Borschow Hospital,* 96 F.3d at 17. CCBN's allegations concerning Thomson Financial's market power are again conclusory rather than fact-based. CCBN states only that Thomson Financial "is the dominant provider of Aggregated Research through its 'First Call' service . . . . Because of ·First Call's dominance in the market for Aggregated Research, analysts that want to reach a large audience of institutional investors must provide data to the First Call service," (Am.Compl.¶ 93) and "[t]hrough First Call, Thomson FINANCIAL possesses market power in the market for Aggregate Research." (Am. Compl.¶ 96.) CCBN also alleges that Thomson Financial charges "supracompet-

itive" prices for its aggregated research product.

The Amended Complaint makes no estimates of Thomson Financial's share of the aggregate research market. To be sure, there is an allegation that Thomson Financial charges supracompetitive prices, and that brokers, institutional investors and publicly traded companies all require current access to First Call's earnings estimated products. Nonetheless, the Amended Complaint does not allege that it can "profitably raise prices substantially above the competitive level." *United States v. Microsoft Corporation,* 253 F.3d 34, 51 (D.C.Cir.2001). There is no allegation of the power to control prices or exclude competition. *Id.* Supracompetitive prices, for example, may be possible because, as the First Amended complaint itself suggests, defendant's aggregated research has become a widely utilized industry gold standard. There are no allegations with respect to whether there are competitors in the market or market barriers to entry. Indeed, as Thomson Financial points out, analysts' research and conference call transcripts are not exclusively within Thomson Financial's control. Nor are there any allegations that information concerning market share is peculiarly in the hands of the defendant and could not be alleged without discovery. *See Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 488 (D.C.Cir.1996) (upholding dismissal of antitrust claim in part for failure to allege defendant's market share, noting: "Evidence regarding the market as a whole is surely as available to Dial A Car as it would be to Red Top and Barwood.").

More must be alleged to satisfy the market power element of a § 1 claim than the mere assertion that such power exists. *See Town of Norwood v. New England Power Company,* 202 F.3d 408, 423 (1st Cir.2000) ("Just how much detail is required in notice-pleading does not have a

formulaic answer; we have been willing to sustain dismissals where a plaintiff's antitrust claim is expressed only in the bare words of the statute, seemed highly improbable, and was not strengthened by more specific detail offered in the face of a direct challenge on motion to dismiss."); *Americana Industries v. Wometco de Puerto Rico, Inc.*, 556 F.2d 625, 627–28 (1st Cir.1977) (dismissing Sherman Act claim, stating: "We do not think that a bare allegation, 'on information and belief,' of malice and a specific intent to put the plaintiff out of business can save a complaint that fails to allege facts and circumstances tending to show that the defendant has substantial market power."). *Compare Hewlett–Packard Company v. Boston Scientific Corp.*, 77 F.Supp.2d 189, 198 (D.Mass.1999) (holding allegations of 90 percent market share of catheters and 40 percent market share of consoles sufficient to state antitrust claim, particularly in light of allegations concerning high barriers to entry in the marketplace posed by patents, regulations and need for technological expertise).

The failure to adequately plead the third element of the § 1 claims relates to CCBN's failure to satisfy the fourth element of the claim, that "the tie forecloses a substantial amount of commerce in the market for the tied product." *Borschow Hospital*, 96 F.3d at 17. In support of this element the complaint states only that "tying has had and will continue to have anticompetitive effects in the market for Aggregated Calendar services." (Am. Compl.¶ 100.) Because the complaint is devoid of factual allegations with respect to the relevant markets it is impossible to discern what effect, if any, Thomson Financial's alleged tying may have in "forec-los[ing]" commerce in the aggregated calendaring market.

 The inadequacies plaguing plaintiff's *per se* theory undermine its rule of reason argument as well. In the absence of *per se* liability, an antitrust plaintiff must show under the rule of reason that defendant's conduct had an "actual adverse effect on competition." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Without factual allegations concerning market share or market power, this inquiry cannot get off the ground. *See Microsoft Corp.*, 253 F.3d at 95 (under rule of reason analysis, plaintiff must carefully define the tied good market and show "barriers to entry other than the tying arrangement itself"). A conclusory allegation of antitrust injury will not suffice where plaintiff is in a position to ascertain the effect of the impermissible conduct. *See R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 487–488 (1st Cir.1994).

The motion to dismiss the § 1 antitrust claims is ***ALLOWED.***

### 2. The Section 2 Claims

 Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ...." 15 U.S.C. § 2. To state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must adequately allege that: "(1) the defendant has monopoly power and (2) the defendant 'has engaged in impermissible "exclusionary practices" with the design or effect of protecting or enhancing its monopoly position.' " *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 195–96 (1st Cir.1996) (citations omitted). To state a claim for attempted monopolization under § 2, a plaintiff must adequately allege "(1) anti-competitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed." *Boston Scientific Corp. v. Schneider*, 983 F.Supp.

245, 268 (D.Mass.1997) (citing *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985)). As for the third element of the attempted monopolization claim, "[t]he probability of successfully monopolizing a market is usually assessed through market share. The greater share a defendant initially controls, the greater the probability of achieving monopoly status." *Hewlett–Packard Company v. Boston Scientific Corp.*, 77 F.Supp.2d at 198 (citing *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683, 693–94 (10th Cir.1989)).

▪ Again, plaintiff's § 2 claims fail because of deficient allegations of Thomson Financial's market in the aggregated calendar market which it was allegedly attempting to monopolize. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) ("[D]emonstrating the dangerous probability of monopolization in an attempt case ... requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 63 F.3d 1540, 1554 (10th Cir.1995) ("Factors relevant to determining dangerous probability include, but are not limited to, a defendant's market share, whether the defendant is a multimarket firm, the number and strength of other competitors, market trends, and entry barriers."); *Hennessy Industries Inc. v. FMC Corp.*, 779 F.2d 402, 404 (7th Cir.1985) (holding § 2 claim "defective because it makes no allegation as to defendants' market power"); *Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 130 (2d Cir.1981) (holding plaintiff submitted insufficient evidence to support jury verdict on antitrust claim where no market share data was presented: "We do not suggest that evidence of market share is invariably a requirement of a monopolization claim,

but when such a traditional form of proof is lacking, the plaintiff must produce unambiguous evidence that the defendant has the power to control prices or exclude competition."). The complaint fails to plead any basis to conclude that Thomson Financial had a monopoly or a dangerous probability of achieving one in the aggregated calendar market. The motion to dismiss the § 2 antitrust claims is *AL-LOWED.*

### ORDER

For the reasons stated, the Defendant's Motion to Dismiss (Docket # 38) is *AL-LOWED* as to counts 1, 7, 8, 9 and 10 and is otherwise *DENIED.*