**TELE ATLAS N.V. and Tele Atlas North America, Plaintiffs,**

v.

**NAVTEQ CORPORATION, Defendant.**

**No. C–05–01673 RMW.**

United States District Court,
N.D. California,
San Jose Division.

Nov. 2, 2005.

John Quinn, David Eiseman, Dominic Surprenant, William Morehead, San Francisco, CA, for Plaintiffs.

Andrew Bridges, San Francisco, CA, Dan Webb, George Lombardi, David Koropp, Chicago, IL, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

### [Re Docket No. 24]

WHYTE, District Judge.

Plaintiffs Tele Atlas N.V. and Tele Atlas North America ("Tele Atlas") have sued defendant NAVTEQ Corporation ("NAVTEQ") for (1) violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, (2) violation of the Clayton Act, 15 U.S.C. § 14, (3) violation of California Business and Professions Code §§ 16720, 16726, 16727, and 17200, (4) intentional interference with contractual relations, and (5) intentional interference with prospective economic advantage. NAVTEQ moves to dismiss Tele Atlas' first amended complaint ("FAC"). The court has read the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, the court grants in part and denies in part NAVTEQ's motion.

## I. BACKGROUND

Tele Atlas and NAVTEQ license digital map data to makers of navigation devices.

FAC ¶ 1. According to Tele Atlas, Etak, Inc. ("Etak") introduced the first consumer navigation system in 1985. *Id.* at ¶ 29. Etak and NAVTEQ were competitors for about ten years. *Id.* at ¶ 30. In 1996, Sony Corporation of America ("Sony") bought Etak. *Id.* at ¶ 31. Tele Atlas contends that Sony limited its investment in Etak, causing Etak to lose its ability to license digital map data effectively and allowing NAVTEQ to dominate the market. *Id.* at ¶ 31. Tele Atlas acquired Etak in 2000. *Id.* at ¶ 32. Between 2000 and 2002 Tele Atlas "upgrade[d] Etak's outmoded digital map data so that it would once again be competitive." *Id.* at ¶ 33. This effort involved dispatching field collectors to drive "over roads covering more than 55% of the populated regions in the United States" and "image-attribut[ing]" 80% of these areas. *Id.*

In January 2003 Tele Atlas allegedly introduced the MultiNet North America: "a map database of North America that supported routing applications to provide precise, efficient, legal and physically reliable turn-by-turn directions[,] . . . featured links to real-time traffic coverage[,] and included a wide range of 'point of interest' such as gas stations, hotels and airports." *Id.* at ¶ 34. By early 2004 Tele Atlas' field collectors had covered 80% of the United States and Tele Atlas' digital map data "was at least commensurate with—and in some respects superior to—the quality of NAVTEQ's digital map data." *Id.* at ¶ 35.

However, Tele Atlas alleges, NAVTEQ's anti-competitive conduct has prevented Tele Atlas from entering the market. *Id.* at ¶ 22. Tele Atlas defines the relevant geographic market as the United States. *Id.* at ¶ 11. According to Tele Atlas, the relevant technological market is the "Perspective Navigation Display Technology Market," which involves "methods for displaying portions of a topographic map on a personal navigation device from an appar-

ent perspective [of] outside and above a vehicle." *Id.* at ¶ 12. Tele Atlas alleges that NAVTEQ enjoys monopoly power in this market. *Id.* at ¶ 13. Tele Atlas contends that there are three relevant product markets: (1) the "Embedded Device Market," which "consists of licenses to digital map data for use in navigation devices that are intended for permanent installation in automobiles," (2) the "PNV Device Market," which "consists of licenses to digital map data for use in personal navigation devices, including handheld devices as well as devices that may be affixed onto or near a car's dashboard," and (3) the "Navigation Device Market," which "consists of licenses to digital map data for use in navigation devices." *Id.* at ¶¶ 14–17. Tele Atlas asserts that NAVTEQ's market share is about (1) 95% of the Embedded Device Market, (2) 70 to 75% of the PNV Device Market, and (3) 75% of the Navigation Device Market. *Id.* at ¶¶ 15–17.

Tele Atlas claims that NAVTEQ's "first mover" advantage in the Embedded Device Market "shield[s its] monopoly power and market power" because automakers "are generally hesitant to switch to new products." *Id.* at ¶ 26. In addition, Tele Atlas contends, NAVTEQ has entered into contracts with automakers "that effectively require embedded device makers to license NAVTEQ data." *Id.* at ¶ 36. Moreover, Tele Atlas asserts, NAVTEQ locked up the Automobile Association of America ("AAA") "by literally giving data away for free to AAA for up to two years." *Id.* at ¶¶ 3, 37.

Tele Atlas also alleges that NAVTEQ has "adopted the same methods used to exclude Tele Atlas from the Embedded Device Market to exclude Tele Atlas from the PNV Device Market." *Id.* at ¶ 40. Tele Atlas contends that NAVTEQ often

requires licensees to pre-pay in amounts that cover five years or more of service. *Id.* at ¶ 41. In addition, according to Tele Atlas, "NAVTEQ provides free sophisticated and eye-catching PNV device displays" for retailers who commit exclusively to showcasing PNV devices that incorporate NAVTEQ's data. *Id.* at ¶ 42. Tele Atlas also asserts that NAVTEQ illegally ties Perspective Navigation Display Technology to the licensing of NAVTEQ's data for use in PNV devices. *Id.* at ¶ 44. According to Tele Atlas, NAVTEQ threatened to sue Navman and TomTom—two PNV device makers that license digital map data from Tele Atlas—for infringing U.S. Phillips Corporation's U.S. Patent No. 5,151,-886 (the " '886 Patent"). *Id.* at ¶ 45. Tele Atlas alleges that NAVTEQ, which licenses the '886 patent, told Navman and TomTom that it would not sue them if they licensed the '886 patent. *Id.* at ¶¶ 46–47. Tele Atlas contends that Navman acquiesced to NAVTEQ's demands. *Id.* at ¶ 49. Tele Atlas claims that TomTom agreed to license the '886 patent from NAVTEQ only after NAVTEQ filed a patent infringement suit against TomTom. *Id.* at ¶ 50.[1]

## II. ANALYSIS

Dismissal under Rule 12(b)(6) is proper only when a complaint exhibits either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept the facts alleged in the complaint as true. *Id.* "A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Gilligan v. Jamco Dev.Corp.*, 108 F.3d 246,

---

1. Tele Atlas asserts that NAVTEQ's conduct also permitted it to monopolize the Navigation Device Market. FAC ¶ 53.

248 (9th Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Federal Rule of Civil Procedure 8(a) requires complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[A]ntitrust pleadings need not contain great factual specificity" than other complaints. *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 648 (9th Cir.1981). "However, the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55

(9th Cir.1994). "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001).

## A. Tele Atlas' Exclusive Dealing Claims

■■■ Tele Atlas' first four causes of action allege that NAVTEQ violated (1) section 1 of the Sherman Act,[2] (2) section 2 of the Sherman Act,[3] (3) section 3 of the Clayton Act,[4] and (4) California Business and Professions Code sections 16720 and 16726.[5] Compl. ¶¶ 54–77. NAVTEQ moves to dismiss these claims to the extent

**2.** Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To state a claim under section 1, a plaintiff must allege "(1) an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *American Ad Mgt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir.1996). However, "any particular exclusive-dealing arrangement does not violate section 1 unless it is found to be unreasonable." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1304 (9th Cir.1982).

**3.** Section 2 of the Sherman Act forbids the "monopoliz[ation], or attempt[ed] ... monopoliz[ation], [of] ... any part of the trade or commerce among the several States." 15 U.S.C. § 2. "In order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must prove: (1)[p]ossession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir.1992) (alteration added). "The following elements are required to establish an attempt to monopolize claim: '(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of

success; and (4) causal antitrust injury.'" *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir.1996) (quoting *Pacific Express*, 959 F.2d at 817). "Although not illegal in themselves, exclusive dealing arrangements can be an improper means of maintaining a monopoly." *U.S. v. Dentsply Intern., Inc.*, 399 F.3d 181, 187 (3d Cir.2005).

**4.** Section 3 of the Clayton Act prohibits improper "tying arrangements": the "lease or ... sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor...." 15 U.S.C. § 14. "In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

**5.** California Business and Professions Code sections 16720 and 16726 outlaw, *inter alia*, conduct that "prevent[s] competition in man-

they allege that NAVTEQ engaged in exclusive dealing. According to NAVTEQ, Tele Atlas has failed to "allege a factual predicate" for these causes of action, "including the specific customers, agreements, or products supposedly involved." Mot. Dism. at 8:23–26.

Courts occasionally seem to reach divergent results on whether antitrust claims contain enough detail to survive a motion to dismiss. Some courts do not require the plaintiff to name the parties who allegedly entered into an illegal contract with the defendant. For example, in *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 872 F.Supp. 52 (S.D.N.Y.1994), Virgin Atlantic Airways ("Virgin") sued British Airways for exclusive dealing. Virgin alleged that British Airways rewarded travel agents for selling specified numbers of British Airways tickets and gave corporate customers rebates "on the condition that they purchase all or a certain high percentage of their travel requirements from British Airways." *Id.* at 56–58. British Airways moved to dismiss, arguing that "the complaint does not identify the specific corporations and travel agents with whom [British Airways] is alleged to have executed illegal agreements." *Id.* at 65–66. The court denied the motion, reasoning that "such specificity is not required when the sources of proof are clearly within the defendant's control." *Id.* at 66.

Likewise, in *Hewlett–Packard Co. v. Arch Associates Corp.*, 908 F.Supp. 265 (E.D.Pa.1995), the court did not require an antitrust plaintiff to name the entities that benefited from the defendant's allegedly anticompetitive conduct. In that case, Arch Associates ("Arch"), a printer dealership, sued Hewlett–Packard ("HP"), an electronics manufacturer. Arch alleged that HP assisted a certain type of dealership by giving them cash rebates without requiring them to document sales. *Id.* at 269. However, Arch's complaint stated only that "HP, in concert with certain members of its authorized distribution network, . . . unlawfully conspired and combined in an effort to expand its monopoly and to further restrain trade." *Id.* (ellipsis in original). HP moved to dismiss on the grounds that Arch's allegations involved "unnamed conspirators" and were "conclusory." *Id.* at 268. The court denied the motion, reasoning that the conspirators were "a finite group whose members can be determined through discovery" and that "the subject matter of the alleged contracts is sufficiently identified by the pleading." *Id.* at 269.

Conversely, in *JM Computer Services, Inc. v. Schlumberger Tech., Inc.*, 1996 WL 241607 (N.D.Cal.1996), a semiconductor testing company sued a competitor for exclusive dealing. The complaint accused the defendant of forming illegal contracts with an ascertainable class of companies:

> [Defendant] entered into exclusive dealing agreements with the manufacturers of the parts . . . in the relevant parts markets that Defendant itself did not manufacture. The purpose of the exclusive agreements was to harm competition in general in the relevant markets. These agreements actually did harm competition in the relevant markets. These exclusive dealing agreements unreasonably deprived [Plaintiff] of a needed source of supply and froze out of the market a significant fraction of the buyers and sellers.

ufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity." "[S]ections 16720 and 16726 . . . were patterned after the Sherman Act" and thus the requirements for stating a claim under both federal and California antitrust statutes are similar. *See Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal.App.3d 532, 540–43, 161 Cal.Rptr. 811 (1980).

*JM Computer*, 1996 WL 241607 at *4 (ellipsis and second alteration in original). Nevertheless, the court dismissed the claim, reasoning that the plaintiff "failed to identify an agreement with a specific person or entity and does not identify the parts, services, or contracts involved in the alleged exclusive dealing." *Id.*

■ The court concludes that Tele Atlas' exclusive dealing claims are sufficiently detailed to survive NAVTEQ's motion. Admittedly, Tele Atlas fails to name the entities with which NAVTEQ supposedly struck exclusive deals. Nevertheless, unlike *JM Computer*, where the plaintiff's skeletal complaint recited only that the defendant had "entered into exclusive dealing arraignments" with "manufacturers of parts," Tele Atlas explains how NAVTEQ's alleged scheme operates. Tele Atlas asserts that NAVTEQ has "enter[ed] into contracts with automakers that effectively require embedded device makers to license NAVTEQ data. Once an automaker agrees to support NAVTEQ, each supplier of embedded devices to that automaker must either license NAVTEQ data or lose the automaker's business." FAC ¶ 36. Other than the reference to "parts manufacturers," the allegations in *JM Computer* declared without explanation that the defendant had broken the law. The allegations here, however, are not mere legal conclusions. Although the line between a fact and a legal conclusion can be razor-thin,[6] Tele Atlas' assertions do not revolve entirely around legal concepts and are better characterized as factual. Because NAVTEQ likely knows the identity of this "finite group" of "automakers," it is on notice of Tele Atlas' claim.

NAVTEQ's other authority is inapposite. NAVTEQ cites *Aquatherm Industries, Inc. v. Florida Power & Light Co.,* 145 F.3d 1258 (11th Cir.1998) and *Nine West Shoes Antitrust Litig.,* 80 F.Supp.2d 181 (S.D.N.Y.2000) for the proposition that "[i]n the similar context of antitrust conspiracies, courts routinely dismiss complaints that fail to identify the alleged co-conspirators." Mot. Dism. at 9:14–21. However, *Aquatherm* actually held that the plaintiff's conspiracy to monopolize claim failed because the plaintiff failed to name co-conspirators and thus could not establish intent to monopolize, a necessary element of the claim. *See Aquatherm,* 145 F.3d at 1261. In addition, the plaintiff's allegations were much like those of the plaintiff in *JM. See id.* (plaintiff alleged that defendant "combined and conspired in a concerted action with manufacturers and sellers of electric pool heat pumps and pool contracting firms in its geographic area"). As discussed above, unlike *Aquatherm,* Tele Atlas has provided *some* modicum of detail. On the other hand, *Nine West Shoes* actually denied a motion to dismiss a conspiracy claim because—as here—"[t]he complaint gives some detail about how this conspiracy operated." *Nine West Shoes,* 80 F.Supp.2d at 191. Thus, the court denies NAVTEQ's motion with respect to Tele Atlas' exclusive dealing causes of action.

## B. Tele Atlas' Tying Claims

■ NAVTEQ also moves to dismiss Tele Atlas' first five causes of action to the extent they allege that NAVTEQ entered into illegal tying arrangements.[7] To state

---

6. That someone did something illegal is, after all, a "fact."

7. Tele Atlas' fifth cause of action is for violation of California Business and Professions Code section 16727. That provision, which is similar to section 3 of the Clayton Act, forbids

parties from making contracts "for the sale of goods, merchandise, machinery, supplies, commodities ... on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodi-

a claim for *per se* tying under sections 1 and 2 of the Sherman Act, a plaintiff must allege that the defendant (1) tied two products or services sold in the relevant markets, (2) had sufficient economic power in the tying market to affect the tied market, and (3) affected a substantial volume of commerce in the tied market. *See California Glazed Prods., Inc. v. Burns & Russell Co.*, 708 F.2d 1423, 1427 (9th Cir.1983). To state a "rule of reason" tying claim, a plaintiff must allege that the defendant (1) entered into a tying arrangement (2) that adversely affected competition. *See Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2, 31, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (plurality opinion). Similar rules apply under the Clayton Act, *see Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 n. 2 (9th Cir.1984), and under California's antitrust statutes, *see Suburban Mobile Homes*, 101 Cal.App.3d at 542–43, 161 Cal. Rptr. 811.

NAVTEQ cites *CCBN.Com, Inc. v. Thomson Fin., Inc.*, 270 F.Supp.2d 146 (D.Mass.2003), *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F.Supp. 1544 (S.D.Tex.1991), and *StunFence v. Gallagher Sec.*, 2002 WL 31109456 (N.D.Ill.2002) to support its contention that Tele Atlas' failure to "allege that the tying arrangement at issue affects a substantial amount of commerce in the tied product market" dooms its claims. Mot. Dism. at 13:12–16.

In NAVTEQ's cited cases, courts dismissed tying claims that were either woefully deficient in crucial areas or could not logically give rise to a viable cause of action. For example, *CCBN.Com*, dismissed a tying claim that failed to (1) allege the existence of contracts that could have given rise to a tying agreement, (2) identify any customers who had entered into such contracts, and (3) estimate the defendant's market share. *See CCBN. Com*, 270 F.Supp.2d at 154–55. Similarly,

in *Rockbit*, the plaintiff alleged that the defendant had "sufficient power in the market for horizontal drilling technology to force the use of its bits on customers because … [the market] is a research intensive, patent dominated, developing field, and [the defendant] is allegedly one of the few companies which has patents in this technology." *Rockbit*, 802 F.Supp. at 1549. Yet the plaintiff did not "identif[y] the patents held by [the defendant], nor … allege[ ] the percentage of the horizontal drilling technology market possessed by [the defendant] which purportedly gives [it] sufficient power to exert coercive pressure on its customers." *Id.* at 1540. Finally, in *StunFence*, the plaintiff's own allegations—that the defendant tied commonly-used products—foreclosed the possibility of proving that the alleged tying "affect[ed] a substantial volume of commerce." *StunFence*, 2002 WL 1838128 at *2.

■ Tele Atlas' tying claims are more specific. Tele Atlas asserts that NAVTEQ used the specter of an infringement suit to bully Navman and Tom Tom into purchasing a license under the '886 patent. FAC ¶¶ 44–50. Thus, unlike the plaintiffs claims in *CCBN.Com*, Tele Atlas' claims spring from specific customers and a specific contract. In addition, unlike the plaintiff in *Rockbit*, Tele Atlas accuses NAVTEQ of misusing a specific patent. Moreover, Tele Atlas estimates that NAVTEQ's market share is about (1) 95% of the Embedded Device Market, (2) 70 to 75% of the PNV Device Market, and (3) 75% of the Navigation Device Market. *Id.* at ¶¶ 15–17. These allegations give rise to a reasonable inference that NAVTEQ's alleged wrongdoing affects a substantial amount of commerce. As such, they suffice to state a tying claim. *See Slattery v. Apple Computer, Inc.*, 2005 WL 2204981

ties, or services of a competitor." Cal. Bus. & Prof.Code § 16727.

*3 (N.D.Cal.2005) (denying motion to dismiss tying claim where plaintiff's allegation "that [d]efendant possess an 80 percent market share" in one relevant market and "over a 90 percent market share" in another revealed that "the tying would have an effect on a substantial volume of commerce").

## C. Tele Atlas' Third and Fifth Causes of Action

■ However, the court must dismiss Tele Atlas' tying allegations in its third and fifth causes of action for another reason. Section 3 of the Clayton Act and California Business and Professions Code section 16727 only forbid tying arrangements with respect to tangible goods. *See* 15 U.S.C. § 14 ("forbidding parties from making tied contracts for the sale of 'goods, wares, merchandise, machinery, supplies, or other commodities'"); Cal. Bus. & Prof.Code § 16727 (applying to "goods, merchandise, machinery, supplies, commodities"). Here, Tele Atlas asserts that NAVTEQ improperly "conditioned the purchase of [a] patent license on the additional licensing of NAVTEQ's digital map data." FAC ¶ 48. A license is not the sale of a tangible good. *See La Salle St. Press, Inc. v. McCormick & Henderson, Inc.*, 293 F.Supp. 1004, 1006 (N.D.Ill.1968) (holding that a patent license is "the sale of the right or privilege of using a particular method or process" and thus does not fall within the word "commodity" under the Clayton Act).

Tele Atlas contends that "the licenses at issue here concern the '886 patent, a patent 'purpot[ing] to claim certain methods and *devices* for the perspective display of a portion of topographic information'" and that "NAVTEQ's license to the '886 patent conveys the right to manufacture 'products'...." Opp. Mot. Dism. at 19:27–20:2 (quoting FAC ¶ 46) (alteration and emphasis added by Tele Atlas). Tele Atlas cites *Ansel Communications v. Novell,* 1999 WL 33302368 (N.D.Cal.1999) for the proposition that courts look to the "dominant nature of the transaction between the parties" to determine "whether [a] contract represents a sale of tangible goods." Opp. Mot. Dism. at 20:7–14 (quoting *Ansel,* 1999 WL 33302368 at *2) (alteration added). According to Tele Atlas, the dominant nature test is fact-intensive and not properly resolved on a motion to dismiss.

■ Tele Atlas' arguments lack merit. "Courts have strictly construed" the term "commodit[y]" and held "that it denotes only tangible products of trade." *Innomed Labs, LLC v. ALZA Corp.,* 368 F.3d 148, 155 (2d Cir.2004) (quoting *May Dep't Store v. Graphic Process Co.,* 637 F.2d, 1211, 1214 (9th Cir.1980)).[8] Indeed, the word "commodity" means a "tangible good, such as products or merchandise." Black's Law Dictionary 291 (8th ed.2004). Thus, courts apply the dominant nature test only where "the subject of the contract is a *combination* of goods and intangible rights and services." *Id.* at 156 (emphasis added). Here, Tele Atlas alleges that NAVTEQ sold a purely ethereal consideration: "the right to manufacture 'products.'" FAC ¶ 46. Because Tele Atlas does not allege that NAVTEQ also sold a physical item, there is no reason to apply the dominant nature test. *See Allen Archery, Inc. v. Browning Mfg. Co.,* 1982 WL 1840 *1–2 (D.Utah 1982) (license granting "the nonexclusive right to manufacture,

---

**8.** *Innomed* expressed no opinion "on whether contracts involving not only the sale of a patented product, but also the right to exploit the patent itself in some way, such as permitting the manufacture of additional products, may be subject to the dominant nature test." *Innomed,* 368 F.3d at 161 n. 4. Here, however, Tele Atlas does not allege that NAVTEQ's licenses, standing alone, involved "the sale of a patented product."

use and sell compound bows ... [is] an intangible right that [i]s in no sense a commodity"); *Record Club of Am., Inc. v. Capitol Records, Inc.,* 1971 WL 558 *3 (S.D.N.Y.1971) ("the right to manufacture embodied in [license] agreements is not a 'commodity' ").

*Ansel* is not to the contrary.[9] In *Ansel,* the court applied the dominant nature test to software licenses under the Robinson–Patman Act, 15 U.S.C. s 13(c). *Ansel,* 1999 WL 33302368 at *2. However, the licensor admitted that its product included "tangible materials, such as disks and packaging." *Id.* Moreover, the licensor's contracts stated that "it is selling 'the tangible personal property described herein.' " *Id.* Accordingly, the court held that factual issues remained as to whether the dominant nature of the agreements was tangible or intangible. *See id.* Here, on the other hand, Tele Atlas does not allege that NAVTEQ's licenses include anything corporeal. Thus, because a patent license is not a tangible good, the court must dismiss Tele Atlas' third and fifth causes of action to the extent they allege tying violations.

### D. Tele Atlas' Unfair Competition and Intentional Interference with Contractual Relations Claims

■ Tele Atlas' sixth and seventh causes of action seek redress for violation of California Business and Professions Code section 17200 and intentional inter-

ference with contractual relations. FAC ¶¶ 83–94. A plaintiff must predicate these causes of action on some other form of illegal conduct. *See Barquis v. Merchants Collection Ass'n,* 7 Cal.3d 94, 113, 101 Cal. Rptr. 745, 496 P.2d 817 (1972) (section 17200 forbids "anything that can properly be called a business practice and that at the same time is forbidden by law"); *PG & E v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990) (intentional interference with contractual relations involves, *inter alia,* "intentional acts designed to induce breach or disruption of [a] contractual relationship"). NAVTEQ moves to dismiss these claims on the grounds that Tele Atlas has failed to state a claim for antitrust violations.[10] As discussed above, the court finds that Tele Atlas has, in fact, stated claims for antitrust violations. Thus, the court denies NAVTEQ's motion with respect to these claims.

### E. Tele Atlas' Intentional Interference with Prospective Economic Advantage Claim

■ Tele Atlas' eighth cause of action claims that "NAVTEQ intended to harm Tele Atlas by interfering with Tele Atlas' prospective contractual relationships ... with third parties." FAC ¶¶ 97. The elements of a claim for interference with prospective economic advantage include, *inter alia,* "an economic relationship between the plaintiff and some third party, with the

---

9. Neither is *May,* which applied the dominant nature test to a contract that involved both an "intangible ingredient, artwork," and "a tangible product," which was the artwork recast in a newspaper-ready form called a "velox." *May,* 637 F.2d at 1216.

10. In its reply brief, NAVTEQ also contends that Tele Atlas "has failed to state a claim for intentional interference with contractual relations because [it] does not allege any breach or disruption of Tele Atlas' relations with its

customers." Rep. Mot. Dism. at 14:19–21. However, Tele Atlas does allege that NAVTEQ forced Navman and Tom Tom to license digital map data, thus disrupting Tele Atlas' contractual relationships with these companies. FAC ¶¶ 45, 88–92. Under the liberal standards of Rule 8, Tele Atlas' pleadings are sufficient. NAVTEQ then argues that Tele Atlas continues to have a vibrant business relationship with Navman and Tom Tom. This argument is not persuasive at the motion to dismiss stage.

probability of future economic benefit to the plaintiff." *Pacific Gas & Elec. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 n. 2, 270 Cal.Rptr. 1, 791 P.2d 587 (1990). Courts often require a plaintiff to identify at least one such "third party" to state a claim. *See, e.g., Morton v. Rank America, Inc.,* 812 F.Supp. 1062, 1075 (C.D.Cal.1993) (dismissing intentional interference with prospective advantage claim where plaintiffs failed to identify any third party with whom it had a "legal relationship"); *Pinnacle Systems, Inc. v. XOS Technologies, Inc.,* 2003 WL 21397845 *6 (N.D.Cal.2003) ("[i]n order to state a claim, [plaintiff] must allege that it had a relationship with and expected to receive an economic benefit from a specific third party"). Because Tele Atlas fails to identify the "third parties" with which it had "economic relationships," the court dismisses this claim.

### III.  ORDER

For the foregoing reasons, the court:

1. Grants NAVTEQ's motion to dismiss Tele Atlas' third and fifth causes of action to the extent they allege tying violations;

2. Grants NAVTEQ's motion to dismiss Tele Atlas' intentional interference with prospective economic advantage claim;

3. Gives Tele Atlas twenty days leave to amend; and

4. Denies NAVTEQ's motion in all other respects.